## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOSEPH JAMES CASTELLANO

     v.                             Case No. 3:10cv794 (SRU)

WARDEN PETER J. MURPHY, ET AL.[1]

### RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

The plaintiff, Joseph James Castellano, currently confined at Garner Correctional in Newtown, Connecticut ("Garner"), has filed this civil rights action *pro se* and *in forma pauperis* pursuant to 28 U.S.C. § 1915.  He alleges *inter alia* that on April 18, 2008, the defendants failed to protect him from assault by another inmate and on various other occasions were deliberately indifferent to medical, mental health or dental needs.

Pending before the court is a motion for summary judgment filed by the plaintiff and a motion for summary judgment filed by the defendants.  For the reasons that follow, the motion for summary judgment filed by the plaintiff is denied and the motion for summary judgment filed by the defendants is granted.

## I.    Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff

---

[1]  The defendants are: Warden Peter Murphy, Deputy Warden Maldanado, Deputy Warden Carol Chapdelaine, Correctional Officer Andy Santaniello, incorrectly listed in the complaint as Santanello, Director of Services Patricia Ottolini, Dr. Joseph Oliveira, incorrectly listed in the complaint as Oliveria, Nurse Barbara LaFrance, incorrectly listed in the complaint as Doctor/Practitioner Le Frau, Dr. Syed Naqvi, Dr. Timothy Silvis, Dr. Raymond Castro, Dr. Dennis Pedersen, Dr. Shepler and Dr. Light.

must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247-48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

Where one party is proceeding *pro se*, the court reads the *pro se* party's papers liberally and interprets them to raise the strongest arguments suggested therein. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Despite this liberal interpretation, however, an unsupported assertion cannot overcome a properly supported motion for summary judgment. *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## II.    Facts[2]

On April 18, 2008, the plaintiff was confined at MacDougall-Walker Correctional Institution in Suffield, Connecticut ("MacDougall") and lived in the Q Unit, Cell 58. At approximately 4:25 p.m. that day, the plaintiff informed Correctional Officer Santaniello that he had been threatened by Inmate Schryver. Officer Santaniello immediately contacted his supervisor, Lieutenant Ron Black, regarding the plaintiff's allegations that he had been threatened by Inmate Schryver. Lieutenant Black reported to Q Unit at approximately 4:45 p.m.

---

[2] The facts are taken from the plaintiff's Local Rule 56(a)2 Statement and attached exhibits and defendants' Local Rule 56(a)1 Statement and Attachment 1 consisting of the Incident Report Package for April 18, 2008 and Attachment 2 consisting of the plaintiff's medical file for the period of January 2007 to November 2010 [Docs. Nos. 19-2 through 19-5].

As he began to speak to Officer Santaniello about the alleged threat, an altercation broke out in the unit dayroom between Inmate Schryver and Inmate Tucker.   Correctional Officer Baraglia witnessed Inmate Schryver punch Inmate Tucker several times and called a Code Blue over his radio.  Other officers responded to the scene of the altercation.

Lieutenant Black, Correctional Officer Baraglia and other correctional staff issued direct orders to Inmates Schryver and Tucker to cease fighting, but the inmates refused to comply. After deploying three bursts of pepper spray at the inmates, Correctional Officers Baraglia, Jaffer and Santaniello were able to secure Inmate Schryver and apply handcuffs to his wrists. Lieutenant Black and Officers Baraglia and Ortiz were able to secure Inmate Tucker and apply handcuffs to his wrists.

As Lieutenant Black was issuing orders to uninvolved inmates to secure themselves within their cells, he looked up to the upper tier and observed an altercation in progress in Cell 58, the plaintiff's cell.  Lieutenant Black then called a second Code Blue and proceeded to Cell 58 with Lieutenant Johnson.  Inmate Civitelli was fighting with the plaintiff in the plaintiff's cell. Verbal orders were issued to the plaintiff and Inmate Civitelli to stop fighting and Inmate Civitelli complied and left the cell.  Correctional Officers Towers and Jaffer secured Inmate Civitelli, applied handcuffs to his wrists and escorted him to the restrictive housing unit.   Under the supervision of Lieutenant Black, Correctional Officers Molden and Michelle secured Inmate Castellano, applied handcuffs to his wrists and escorted him to the medical area on the top tier of Q Unit.

The medical staff assessed the plaintiff's injuries and then cleared him for escort to the main medical unit at MacDougall for further treatment of the bite wound inflicted by Inmate Civitelli.  Lieutenant Black observed that the bite had resulted in a piece of flesh being removed

from the area above the plaintiff's left eye.   Lieutenant Black and Officers Molden and Michelle

then escorted the plaintiff to the main medical unit for additional treatment of his injuries.

Nurse Barbara LaFrance assessed and treated the plaintiff's injuries.  She cleaned the area

of the bite mark with Betadine, applied antibiotic ointment and covered the area with a dry,

sterile pressure dressing.  Nurse LaFrance then gave the plaintiff a Tetanus shot and an oral

antibiotic.  She also ordered that an x-ray be taken of the plaintiff's jaw.   The plaintiff was

started on a different oral antibiotic beginning on April 21, 2008.  The plaintiff took that

antibiotic twice a day for ten days.   Over the next nine days, medical staff routinely examined

the plaintiff's wound, cleaned it and applied antibiotic ointment and dressing changes as

necessary.

### III.    Plaintiff's Motion for Summary Judgment [Doc. No. 18]

The plaintiff argues that there are no issues of material fact in dispute and he is entitled to

summary judgment as a matter of law.  The motion consists mainly of the standard to be applied

in deciding a motion for summary judgment and the law governing Section 1983 civil rights

actions and claims of deliberate indifference to medical needs under the Eighth Amendment.

Rule 56(a) of the Local Rules requires that a motion for summary judgment be

accompanied by "a document entitled 'Local Rule 56(a)1 Statement,' which sets forth in

separately numbered paragraphs meeting the requirements of Local Rule 56(a)3 a concise

statement of each material fact as to which the moving party contends there is no genuine issue

to be tried."  Rule 56(a)3 requires that each statement in the Rule 56(a)1 Statement "must be

followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts

at trial and/or (2) evidence that would be admissible at trial.  The affidavits, deposition

testimony, responses to discovery requests, or other documents containing such evidence shall be

filed and served" with the Local Rule 56(a)1 Statement.  This specific citation requirement applies to *pro se* litigants as well as to attorneys.  Rule 56(a)4 also requires that the movant file a memorandum in support of his motion.

The motion for summary judgment filed by the plaintiff contains some of the allegations in the complaint related to medical treatment he received from the defendants at various times between 1997 and 2008.  The plaintiff has not filed a separate Local Rule 56(a)1 Statement.  Thus, his motion for summary judgment fails to comply with court rules.  Additionally, the allegations and arguments in the plaintiff's motion and affidavit[3] regarding his medical conditions and treatment of those conditions, without more, do not entitle the plaintiff to judgment as a matter of law on his Eighth Amendment claims of deliberate indifference to serious medical needs.  *See Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976) (to prevail on claim of deliberate indifference to medical needs, a plaintiff must provide evidence of sufficiently harmful acts or omissions and intent to either deny or unreasonably delay access to needed

---

[3]  The plaintiff filed an Affidavit on March 29, 2012, almost a year after he filed his motion for summary judgment.  (*See* Castellano Aff., Doc. No. 29.)  The plaintiff claims that the Affidavit and evidence attached to the Affidavit pertain to the claims in the complaint.  The court disagrees.  The Affidavit is not made on personal knowledge and includes legal arguments rather than factual statements.  *See* Rule 56(c)(4), Fed. R. Civ. P., ("[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated").  Furthermore, the Affidavit does not show that the plaintiff is competent to testify as to the information contained in it.   In addition, most of the documentary evidence attached to the Affidavit does not relate to the claims in the complaint.  The plaintiff has not sought leave nor been granted leave to amend the complaint to add new claims.  At this late date, it would unnecessarily delay the action and would be prejudicial to the defendants to permit the plaintiff to amend the complaint.  Justice does not require the court to permit the plaintiff to add new claims at this point in the litigation.  *See* Fed. R. Civ. P. 15(a)(2) (after the time to amend as of right has passed, "[t]he court should freely" grant leave to amend "when justice so requires"); *Foman v. Davis*, 371 U.S. 178, 182 (1962) (the court considers such factors as undue delay, bad faith, dilatory motive, undue prejudice and futility of the amendment, in determining whether to grant leave to amend).

medical care or the wanton infliction of unnecessary pain by prison personnel).  Accordingly, the motion for summary judgment filed by the plaintiff is denied.

IV.     **Defendants' Motion for Summary Judgment [Doc. No. 19]**

The defendants argue that Officer Santaniello, Warden Murphy and Deputy Wardens Maldanado and Chapdelaine did not fail to protect the plaintiff from assault by Inmate Civitelli and that Drs. Pedersen, Oliveira, Naqvi, Silvis, Castro, Shepler and Light, Nurse LaFrance and Director Ottolini were not deliberately indifferent to the plaintiff's medical, mental health and dental needs.  The defendants also argue that they are entitled to qualified immunity.

A.     **Failure to Protect Claims**

The plaintiff contends that defendant Santaniello was on notice of a potential threat to harm him by Inmates Civitelli and Schryver, but he failed to take appropriate measures to protect him from assault by Inmate Civitelli.  The plaintiff also contends that he was assaulted by Inmate Civitelli because defendants Maldanado, Chapdelaine and Murphy failed to institute measures to stem the build up of various inmate gangs and hate groups at MacDougall.  The defendants argue that they were not deliberately indifferent to the plaintiff's safety.

1.  **Officer Santaniello**

It is well-settled that, under the Eighth Amendment, "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners."  *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (internal quotation marks and citation omitted).   In *Wilson v. Seiter*, 501 U.S. 294, 303 (1991), the United States Supreme Court described "the protection [an inmate] is afforded against other inmates" as a "condition of his confinement."  To state an Eighth Amendment claim based on the conditions of confinement, a plaintiff must allege that the prison official's conduct was objectively "sufficiently serious" and that "the officials acted, or omitted

to act, with a sufficiently culpable state of mind, *i.e.*, with deliberate indifference to inmate health or safety." *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (internal quotation marks and citations omitted).

A prisoner's conditions of confinement must meet "minimal civilized measures of life's necessities." *Wilson*, 501 U.S. at 298. This means that prison officials must provide for inmates' basic human needs - e.g., food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 200 (1989). A prison official's act or omission is sufficiently serious if it results in the denial of the inmate's basic human needs.

To satisfy the subjective requirement of an Eighth Amendment conditions claim, the plaintiff must demonstrate both that he is incarcerated under conditions that pose a substantial risk of serious harm and that the defendant prison officials possessed culpable intent, that is, the officials knew that the inmate faced a substantial risk to his health or safety and disregarded that risk by failing to take corrective action. *See Farmer*, 511 U.S. at 834, 837. A prison official who "actually knew of a substantial risk to inmate health or safety," but responded in a reasonable manner to the risk, "may be found free from liability" under the Eighth Amendment, "even if the harm ultimately was not averted." *Id.* at 844. Allegations constituting mere negligence are not cognizable under section 1983. *See Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 620 (2d Cir. 1996).

The defendants concede that the plaintiff's safety as it relates to being exposed to an assault by another inmate constitutes a basic human need. The defendants argue, however, that they were not deliberately indifferent to the plaintiff's safety because they did not know that Inmate Civitelli posed a risk to the plaintiff.

The plaintiff alleges that at approximately 4:25 p.m. on April 18, 2008, he informed Correctional Officer Santaniello that Inmate Van Schryver and Inmate Jared Civitelli, who were cellmates, had threatened him.  The plaintiff claims to have requested that Officer Santaniello place his cell on "dead lock" and to inform proper supervisory officials of the threat and to ask them to protect him from bodily harm.

In a statement made in support of an Incident Report generated after the assault on the plaintiff by Inmate Civitelli, Officer Santaniello relates that the plaintiff informed him that he felt threatened by Inmate Schryver.  (*See* Defs.' Local Rule 56(a)1 Statement, Attach. 1 at 6.)  In response, Officer Santaniello contacted Lieutenant Black regarding the plaintiff's statement.  Lieutenant Black arrived in the dayroom of the plaintiff's housing unit at approximately 4:45 p.m. to discuss the plaintiff's statement with Officer Santaniello.  Moments after his arrival, Inmate Schryver, who was in the dayroom, punched Inmate Tucker in the side of his head.  Lieutenant Black then called a Code Blue.  Officer Santaniello, Lieutenant Black and other officers were able to secure Inmates Schryver and Tucker after deploying several bursts of pepper spray.   (*See id.* at 6, 12.)

Lieutenant Johnson arrived at the scene just as Lieutenant Black was securing Inmate Tucker.  Lieutenant Johnson and Lieutenant Black looked up to the top tier of the housing unit and noticed that a physical altercation was in progress in the plaintiff's cell, Q-58.  *(See id.)*  Lieutenants Black and Johnson called another Code Blue and proceeded to the plaintiff's cell.  They observed the plaintiff fighting with Inmate Civitelli.  Lieutenant Black issued several verbal orders to the plaintiff and Inmate Civitelli to stop fighting.  Inmate Civitelli then stopped fighting and exited the plaintiff's cell.   During the fight, Inmate Civitelli bit the plaintiff in the

forehead above his right eye.  Two officers applied restraints to Inmate Civitelli and escorted him out of the housing unit.  *(See id.)*

Two other officers applied restraints to the plaintiff and escorted him to the medical area within the housing unit under the supervision of Lieutenant Black for on-site assessment and treatment of his injuries.  These same officers then escorted the plaintiff to the main medical department for further assessment and treatment of his injuries.  *(See id.)*

The defendants contend that, although the plaintiff informed Officer Santaniello that Inmate Schryver had threatened to harm him, they had no warning or notice that the plaintiff may have been at risk of any harm from Inmate Civitelli.   The plaintiff alleged in his complaint that prior to the assault by Inmate Civitelli, he had informed Officer Santaniello that both Inmate Schryver and Inmate Civitelli had threatened to harm him.  (*See* Compl. at 6.)  Because the contents of the complaint are sworn to under the penalty of perjury, the court considers it to be the equivalent of an affidavit for purposes of defendants' summary judgment motion.  *See Franco v. Kelly*, 854 F.2d 584, 587 (2d Cir. 1988) (citing *Pfeil v. Rogers*, 757 F.2d 850, 859 & n. 5 (7th Cir.1985) (noting that documents sworn under penalty of perjury may suffice for summary judgment purposes even if they do not meet all of the formal requirements of a notarized affidavit)), *cert. denied*, 475 U.S. 1107 (1986)).

The plaintiff argues further that the defendants were on notice of the potential "volitility" of Inmate Civitelli due to the fact that he was an acquaintance of Inmate Schryver.  (*See* Pl.'s Local Rule 56(a)2 Statement at ¶ 10.)   In support of this statement, the plaintiff cites to a sentence from one page of the Connecticut Department Of Correction Incident Report documenting the April 18, 2008 altercations between the plaintiff and Inmate Civitelli and Inmate Schryver and Inmate Tucker.   (*See* Defs.' Local Rule 56(a)1 Statement, Attach. 1 at 14.)

The sentence was included in Lieutenant Andrew Johnson's report and related to his interview of Inmate Schryver after his altercation with Inmate Tucker.  Inmate Schryver stated that earlier that day he had asked Inmate Tucker a question, but Tucker had refused to answer it and turned his back.  Inmate Schryver, who has been a member of the Aryan Brotherhood, found it very disrespectful for Inmate Tucker, who is Black, to have turned his back in answer to a question. The court cannot discern how a statement by Inmate Schryver explaining the reason that he had assaulted inmate Tucker demonstrates knowledge by Officer Santaniello of potential harm to the plaintiff by Inmate Civitelli.   Both the plaintiff and Inmate Civitelli are listed as White on page six of the Department of Correction Incident Report.  (*See* Defs.' Local Rule 56(a)1 Statement, Attach. 1 at 6.)   The plaintiff does not dispute this fact.

The statement of the plaintiff that he informed Officer Santaniello that he was at risk of harm from both Inmate Schryver and Inmate Civitelli creates a potential issue of material fact as to whether the plaintiff put Officer Santaniello on notice of the threat to his safety by Inmate Civitelli.  Even if Officer Santaniello was on notice that Inmate Civitelli had threatened to harm the plaintiff, however, the evidence submitted by the defendants shows that Officer Santaniello's response to the risk of harm was reasonable.

The plaintiff alleges that he informed Officer Santaniello of the threat by Inmate Schryver at approximately 4:25 p.m.  (*See* Compl. at 6.)  Officer Santaniello stated that he contacted his superior, Lieutenant Black, as soon as the plaintiff informed him of the threat to harm him by Inmate Schryver.   (*See* Defs.' Local Rule 56(a)1 Statement, Attach. 1 at 6.) Lieutenant Black noted that he came to the housing unit to speak to Officer Santaniello at 4:45 p.m., approximately twenty minutes after the plaintiff allegedly informed Officer Santaniello about the potential threat against him.  (*See id.* at 12.)  Within minutes of Lieutenant Black's

arrival in the dayroom of the housing unit, Inmate Schryver punched Inmate Tucker and an altercation ensued.   Lieutenant Johnson arrived at the scene approximately three minutes later and noticed that a fight had broken out in the plaintiff's cell.   (*See id.* at 14.)

It is apparent that Officer Santaniello responded appropriately to the information from the plaintiff about another inmate or inmates threatening to harm him.  He contacted his supervisor, who responded quickly to the unit.   The fights broke out within minutes of Lieutenant Black's arrival.  Officer Santaniello's actions in informing his superior, Lieutenant Black, of the potential threats to harm the plaintiff by other inmates were reasonable in response to the risk facing the plaintiff. *See Farmer*, 511 U.S. at 844 (A prison official who "actually knew of a substantial risk to inmate health or safety," but responded in a reasonable manner to the risk, "may be found free from liability" under the Eighth Amendment, "even if the harm ultimately was not averted."). The plaintiff has failed to present any evidence to suggest that there were any other measures that Officer Santaniello could have taken in response to the information provided by him. Accordingly, the motion for summary judgment is granted with respect to the claims of deliberate indifference to safety against defendant Santaniello.

### 2.  Warden Murphy and Deputy Wardens Maldanado and Chapdelaine

The plaintiff has asserted a second claim of deliberate indifference to his safety.  He alleges that prior to April 2008, defendants Deputy Wardens Maldanado and Chapdelaine and Warden Murphy were aware of the build up of various inmate gangs and hate groups at MacDougall.  The plaintiff claims that these defendants failed to respond in an appropriate manner to the increase in the presence of inmate gangs and hate groups at MacDougall, which led to the assault on him by Inmate Civitelli on April 18, 2008.

All of the evidence presented by the defendants regarding the assault on the plaintiff by Inmate Civitelli on April 18, 2008, suggests that it stemmed from an incident involving a CD player that the plaintiff traded to Inmate Schryver in exchange for some other items or property.[4] When the CD player stopped working, Inmate Schryver wanted his other items back, but the plaintiff would not or could not give them back.  (*See* Defs.' Local Rule 56(a)1 Statement, Attach. 1 at 4, 8-10.)  Inmate Schryver then threatened to harm the plaintiff because the plaintiff refused to return the items that had been given to him in exchange for the defective CD player. Inmate Civitelli, who was a friend and cellmate of Inmate Schryver's, was angry that the plaintiff had allegedly informed a correctional counselor about the CD player and Inmate Civitelli took it upon himself to assault the plaintiff over the faulty CD player.   (*See id.* at 8-10.)

The correctional officials involved in investigating the assault determined that it was not gang-related.  (*See* Defs.' Local Rule 56(a)1 Statement, Attach. 1 at 5, 9.)  The plaintiff has provided no evidence to contradict the evidence submitted by the defendants regarding the basis for the assault.  Nor has the plaintiff submitted any proof to show that the assault was the result of an alleged build up of inmate gangs or hate groups at MacDougall.  Thus, the plaintiff has failed to meet his burden of proving that defendants Maldanado, Chapdelaine and Murphy were aware of a threat to his safety and failed to take reasonable measures to protect him from that threat.  The motion for summary judgment is granted as to the deliberate indifference to safety claims against defendants Maldanado, Chapdelaine and Murphy.

---

[4]  The plaintiff initially told Lieutenant Black that he had traded the CD player to Inmate Civitelli, but then later informed Captains Beaudry and Manley that he had traded the CD player to Inmate Schryver.   Inmates Schryver and Civitelli, as well as several other inmates interviewed regarding the incident, confirmed that the plaintiff had traded the CD player to Inmate Schryver.   (*See* Defs.' Local Rule 56(a)1 Statement, Attach. 1 at 8-9.)

**B.      Medical and Mental Health Care Claims**

The plaintiff claims that at various times beginning in 1991, defendants Oliveira and Shepler were deliberately indifferent to his mental health needs, defendant Pedersen was deliberately indifferent to his dental needs, and defendants Ottolini, LaFrance, Naqvi, Silvis, Castro and Light were deliberately indifferent to his medical needs.  The defendants assert that some of the plaintiff's claims are barred by the statute of limitations and others fail to state a claim under the Eighth Amendment.

The Supreme Court has held that deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment.  *See Estelle*, 429 U.S. at 104.   Courts within the Second Circuit have also applied the deliberate indifference standard set forth in *Estelle* to claims of denials or delays in treatment of dental and mental health needs.  *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (deliberate indifference to medical needs standard applicable to claim that prison dentists failed to properly treat severe tooth decay);  *Harrison v. Barkley*, 219 F. 3d 132, 136-37 (2d Cir. 2000) (applying deliberate indifference standard in *Estelle* to claim of untreated tooth cavity);  *Atkins v. County of Orange*, 372 F. Supp. 2d 377, 408 (S.D.N.Y. 2005) ("In the Second Circuit, psychiatric or mental health care 'is an integral part of medical care' and falls under the rule laid out in *Estelle* which requires that such care be provided to prisoners.") (quoting *Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989)); *Guglielmoni v. Alexander*, 583 F. Supp. 821, 826 (D. Conn. 1984)  ("deliberate indifference standard of *Estelle* is equally applicable to the constitutional adequacy of psychological or psychiatric care provided at a prison") (citations and internal quotation marks omitted).

To prevail on such a claim, a plaintiff must provide evidence of sufficiently harmful acts or omissions and intent to either deny or unreasonably delay access to needed medical care or the wanton infliction of unnecessary pain by prison personnel.  *See id.* at 104-06.  Mere negligence will not support a section 1983 claim; "the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law."  *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003).  Thus, "not every lapse in prison medical care will rise to the level of a constitutional violation," *id.*; rather, the conduct complained of must "shock the conscience" or constitute a "barbarous act."  *McCloud v. Delaney*, 677 F. Supp. 230, 232 (S.D.N.Y. 1988) (citing *United States ex rel. Hyde v. McGinnis*, 429 F.2d 864 (2d Cir. 1970)).

There are both subjective and objective components to the deliberate indifference standard.  *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), *cert. denied sub nom. Foote v. Hathaway*, 513 U.S. 1154 (1995).  Objectively, the alleged deprivation must be "sufficiently serious."  *Wilson*, 501 U.S. at 298.  The condition must produce death, degeneration or extreme pain.  *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  Subjectively, the defendant must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his actions or inactions.  *See Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006).  Thus, the fact that a prison official did not alleviate a significant risk that he should have but did not perceive does not constitute deliberate indifference.  *See Farmer*, 511 U.S. at 834, 838.

The Second Circuit has identified several factors that are highly relevant to the inquiry into the seriousness of a medical condition.  For example, a medical condition significantly affecting the inmate's daily activities or causing chronic and significant pain or the existence of an injury a reasonable doctor would find important constitutes a serious medical need.  *See*

*Chance*, 143 F.3d at 702.  In addition, where the denial of treatment causes plaintiff to suffer a permanent loss or life-long handicap, the medical need is considered serious.  *See Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000).

The second prong of deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance*, 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104.  A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference.  *Chance*, 143 F.3d at 703.  "Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim." *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citing *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)).

### 1.   Doctors Shepler, Light and Pedersen

The defendants argue that the claims of deliberate indifference to medical, mental health and dental needs against defendants Shepler, Light and Pedersen are barred by the statute of limitations.  The plaintiff does not address this argument.

The plaintiff alleges that, in January 1991, he was confined at the Bridgeport Correctional Center ("Bridgeport").  Prison officials transferred him to the infirmary at Bridgeport because of his complaints of chronic back pain.  At one point during his confinement in the infirmary, Dr. Schepler, who is a psychiatrist, interviewed the plaintiff regarding his mental health conditions. Dr. Shepler prescribed two medications to treat the plaintiff's mental health conditions.  The plaintiff alleges that these medications diminished his long- and short-term memory to the extent

that he was unable to assist in his defense prior to and during his criminal trial.  In January 1993, the plaintiff pleaded guilty to felony murder, robbery and escape and agreed to a sentence of sixty years.

The plaintiff alleges that, in November 1997, he was incarcerated at Garner.  At that time, Dr. Light gave him a flu shot using a needle that had been used on fourteen other inmates.

The plaintiff claims that, in June 2001, he was incarcerated at Garner and requested to be seen by a dentist.  Dr. Dennis Pedersen prescribed "100% Flouride in gel and a box of swish and spit" and instructed the plaintiff to brush with a combination of both products two times a day. Compl. at 4.  The plaintiff alleges that within two or three months, he developed tooth decay in all of his teeth.  Dr. Pedersen could not understand why the plaintiff had developed tooth decay. He first filled cavities in two teeth and then thirty days later pulled both teeth.  The method used by Dr. Pedersen to pull the two decayed teeth caused several other teeth to break.  In addition, the plaintiff suffered pain, infection and gum deformation as a result of the extraction procedure.

The limitations period for filing an action pursuant to 42 U.S.C. § 1983 is three years. *See Lounsbury v. Jeffries*, 25 F.3d 131, 134 (2d Cir. 1994) (holding that, in Connecticut, the general three-year personal injury statute of limitations period set forth in Connecticut General Statutes § 52-577 is the appropriate limitations period for civil rights actions asserted under 42 U.S.C. § 1983).

The plaintiff filed this action on May 14, 2010, the date on which the court assumes that he handed the Complaint and Application to Proceed *In Forma Pauperis* to prison officials for filing.[5]  *See Dory v. Ryan*, 999 F.2d 679, 682 (2d Cir. 1993) (Second Circuit has held that a *pro*

---

[5]  The Complaint is dated May 7, 2010, but the Certification of Inmate Account Balance attached to the Application to Proceed *In Forma Pauperis* is dated May 14, 2010.   (*See* Application to Proceed *In Forma Pauperis* at 5.)

*se* prisoner complaint is deemed filed as of the date the prisoner gives the complaint to prison officials to be forwarded to the court) (citing *Houston v. Lack*, 487 U.S. 266, 270 (1988)).  The claims against defendants Pedersen, Light and Shepler all accrued more than three years prior to the filing of the complaint.  The plaintiff has offered no evidence to suggest that tolling of the statute of limitations is warranted.  The claims of deliberate indifference to medical, dental and mental health needs against defendants Light, Pedersen and Shepler are barred by the statute of limitations.  The motion for summary judgment is granted on this ground.

### 2.  Defendant Ottolini

The plaintiff alleges that, in 1982, he was a United States Marine at the Naval Base in Hawaii.  At that time, a physician diagnosed him as suffering from severe bilateral hearing loss.  The plaintiff claims that an audiologist evaluated him in 2002 or 2003.  Based on the evaluation, the government awarded him disability payments and two hearing aids.  The plaintiff claims that he has been without the use of hearing aids from 1991 to 2008.

The plaintiff's medical records reflect that, in late June 2007 at Garner, Dr. O'Halloran submitted a request to the Utilization Review Committee ("URC") to have the plaintiff undergo an audiogram at the University of Connecticut Health Center ("UCONN") due to his claimed hearing loss.  (*See* Defs.' Local Rule 56(a)1 Statement, Attach. 2 at 88-89.)  On July 10, 2007, the URC approved the request.  (*See id.* at 90-91.)  In September 2007, an audiologist at UCONN examined and tested the plaintiff's hearing.  She concluded that the plaintiff suffered from bilateral sensorineural hearing loss of significant severity and recommended that the plaintiff be fitted for a hearing aid in each ear.  (*See id.* at 77-79.)  On September 13, 2007, the URC approved a unilateral hearing aid for the plaintiff.  (*See id.* at 92.) The URC directed the audiologist to determine whether the hearing aid should be used in the plaintiff's left or right ear.

The plaintiff's medical records include a URC form indicating that an ear mold impression was taken of the plaintiff's left ear in December 2007.  (*See id.* at 75-76, 208-09).  On February 20, 2008, the plaintiff was scheduled to go to UCONN for a hearing aid fitting, but he refused to be transported to the appointment and told medical personnel at MacDougall that he did not need hearing aids any more.  (*See id.* at 584.)

In September 2008, the plaintiff informed the medical department at MacDougall that he would be willing to go for the fitting.  A physician at MacDougall then submitted a renewed request to have the plaintiff sent to UCONN for the hearing aid fitting.  The URC approved the request in mid-September 2008.  (*See id.* at 289-90.)  On December 17, 2008, the plaintiff went to the fitting at UCONN and received a hearing aid for his left ear.  (*See id.* at 257.)  In August 2009, the plaintiff received a replacement hearing aid because the one he had received in 2008 was no longer operable.  (*See id.* at 288, 614, 627.)

The plaintiff claims that, since the diagnosis of bilateral hearing loss in 1991, he has always needed hearing aids in both ears.  He further asserts that the manufacturer of the hearing aid that he received in 2008 recommended using two hearing aids because the use of only one hearing aid might cause dizziness, vertigo, headaches or disorientation.  The plaintiff alleges that defendant Patricia Ottolini, Director of Health and Addiction Services for the Department of Correction, was aware of the manufacturer's recommendation.

The defendants concede that the plaintiff's hearing loss constitutes a serious medical condition.  Defendant Ottolini argues, however, that she was not deliberately indifferent to that condition.

The plaintiff's medical records reflect that the medical personnel at both MacDougall and Garner responded to the plaintiff's complaints about his hearing loss and requests for treatment.

Requests were submitted to the URC for hearing evaluations, an audiologist evaluated the plaintiff's hearing loss and made a recommendation that the plaintiff be fitted with bilateral hearing aids.  The URC, however, decided that the plaintiff only needed a hearing aid in one ear.

The plaintiff has not alleged that defendant Ottolini, or any of the other defendants for that matter, were members of the URC when it determined that the plaintiff should only be fitted for one hearing aid.  Furthermore, the plaintiff has failed to submit any evidence to support his claim that the hearing aid manufacturer recommended that an individual wear two hearing aids due to certain side-effects of wearing just one hearing aid.  Nor has the plaintiff offered evidence to confirm his allegation that defendant Ottolini was aware of that recommendation.  As such, the plaintiff has not provided any evidence that defendant Ottolini was deliberately indifferent to his serious hearing condition.  The motion for summary judgment is granted as to the claims against defendant Ottolini.

### 3.  Defendant Oliveira

The plaintiff alleges that, in August 2007, he was incarcerated at Garner.  At that time, Dr. Oliveira was the plaintiff's psychiatrist.  The plaintiff claims that, on August 7, 2007, Dr. Oliveira  ordered that he be transferred to MacDougall despite the fact that he was a diagnosed paranoid schizophrenic, suffered from anxiety, and was over fifty-seven years of age.  The plaintiff contends that the transfer to MacDougall caused him to suffer distress and chronic clinical depression.

The plaintiff's medical records reflect that, in January 2007, Dr. Oliveira diagnosed him as suffering from chronic paranoid schizophrenia.  (*See id.* at 38.)  From January to August 2007, Dr. Oliveira examined the plaintiff on a monthly basis and prescribed medication to treat his psychiatric condition.  (*See id.* at 1-38, 215-24.)  In March 2007, the plaintiff asked Dr. Oliveira

to discontinue one of his mental health medications.  (*See id.* at 224.)  Dr. Oliveira suggested that he reduce the dosage slowly.  The plaintiff agreed to that plan.

On July 11, 2007, the plaintiff informed Dr. Oliveira that he would like to have the dosage of one of his mental health medications decreased to once a day, have his mental health score lowered and to be transferred to another prison facility.  (*See id.* at 215.)  Dr. Oliveira explained that if his mental health score was lowered to a three, he would no longer require level four mental health housing.  (*See id.*)  Dr. Oliveira noted that the plaintiff was alert and oriented, his mood was stable, his speech was within normal limits, his affect was congruent with a full range of expression, he was in control of his behavior and was goal directed, he did not present as paranoid and there were no overt signs of psychosis, auditory hallucinations, suicidal ideation or cognitive deficits.  Dr. Oliveira changed the medication order to one tablet a day at bedtime, recommended that the plaintiff continue to take all his mental health medications regularly and that he return to the mental health department in two to four weeks to be considered for a reduction in his mental health score.  (*See id.*)

The plaintiff's medical records reflect that Dr. Oliveira as well as other mental health professionals at Garner regularly examined, evaluated and treated the plaintiff's mental health symptoms and conditions.  In addition, in July 2007, the plaintiff requested that he be transferred out of Garner to another prison facility.  Dr. Oliveira noted that the symptoms of the plaintiff's mental health conditions had improved in July 2007 and were being effectively treated with medication.

In early August 2007, a decision was made by mental health officials at Garner to lower the plaintiff's mental health score to level three and to transfer the plaintiff to a prison facility that housed inmates with mental health scores of three or lower.  (*See id.* at 74.)  On August 7,

2007, the plaintiff was seen in the mental health unit at Garner and cleared for transfer to MacDougall.   The plaintiff remained at MacDougall until the end of January 2009.[6]

The medical records pertaining to the plaintiff's incarceration at MacDougall from August 2007 to January 2009 reflect that medical and mental health professionals as well as licensed social workers at the facility regularly examined and evaluated the plaintiff and prescribed medication to treat his mental health conditions.   The plaintiff has offered no evidence to suggest that mental professionals at MacDougall were unable to properly treat or manage his mental health conditions.   Thus, the plaintiff has failed to demonstrate that Dr. Oliveira's participation in the decision in August 2007 to lower the plaintiff's mental health score and approve the plaintiff's transfer to a lower level prison facility constituted deliberate indifference to the plaintiff's mental health needs.   Accordingly, the motion for summary judgment is granted with respect to all claims against defendant Oliveira.

### 4.   Defendants LaFrance, Naqvi and Silvis

The plaintiff asserts that, after the assault by Inmate Civitelli on April 18, 2008, he complained of dizziness, blurred vision and cognitive disassociation as well as severe pain in his face, shoulder, neck, back and jaw.   He argues that Nurse LaFrance and Drs. Naqvi and Silvis were deliberately indifferent to these medical conditions.

### a.   Bite Wound and Facial and Jaw Pain

Nurse LaFrance examined the plaintiff immediately after the assault and described the plaintiff's injuries as a small, superficial abrasion on the left side of the plaintiff's back, a bite mark above the plaintiff's left eyebrow, a painful jaw on the left side and a slight bruise to the

---

[6]   The plaintiff's medical records reflect that prison officials at MacDougall transferred the plaintiff back to Garner for about a week in late December 2007 because the plaintiff had threatened to harm himself.  The plaintiff returned to MacDougall in early January 2008.   (*See id.* at 200-04, 588-9474.)

left eye.  She did not note any complaints by the plaintiff of dizziness, blurred vision or cognitive

disassociation.  (*See id.* at 576.)

She cleaned the area of the bite mark with Betadine, applied antibiotic ointment and

covered the area with a dry, sterile pressure dressing.  Nurse LaFrance then gave the plaintiff a

tetanus shot and an oral antibiotic.  (*See id.*)  Nurse LaFrance also ordered that an x-ray be taken

of the plaintiff's jaw.  (*See id.* at 317.)  The plaintiff underwent an x-ray of his jaw on April 22,

2008.  The x-rays revealed no dislocations, fractures or signs of acute abnormality.  (*See id.* at

266.)

A nurse examined the wound above the plaintiff's eyebrow on April 19, 2008 and noted

that there was some old bloody drainage on the dressing, but the area under the dressing looked

clean and there was no new bleeding.   The nurse cleaned the area with Betadine, applied

antibiotic ointment and covered the area with a new dressing.   In response to the plaintiff's

complaints of a headache, the nurse gave the plaintiff 600 milligrams of Motrin.  (*See id.* at 575.)

On April 26, 2008, the plaintiff reported to the medical department for a dressing change,

but informed the nurse that he had taken the dressing off the prior evening.  The nurse cleansed

the wound with Betadine, applied antibiotic ointment and covered the area with a new dressing.

The plaintiff was seen again in the medical department on April 27, 2008, for a dressing change.

The nurse noted that the wound was open to the air, there was no drainage and that a scab had

formed over the wound.  She again cleansed the wound with Betadine, applied antibiotic

ointment and covered the area with a dressing.  (*See id.* at 575.)

On April 28, 2008, the plaintiff reported to the medical department for a dressing change.

The nurse noted that the wound was open to the air and there was no drainage coming from the

wound.  After cleaning the wound, the nurse left the wound open to the air and provided the

plaintiff with band-aids that he could use during recreation.  The nurse instructed the plaintiff to submit a request to be seen in the medical department if he experienced any signs of infection, drainage, redness or warmth in the area of wound or he felt feverish.  (*See id.* at 574.)

The plaintiff contends that the wound above his left eyebrow should have been stitched up.  There is no evidence to suggest that the medical professionals who examined the wound determined that it required stitches.  The records reflect that nurses kept the wound clean and applied antibiotic ointment as well as regular dressing changes.  In addition, a physician prescribed a tetanus shot as well as medication to be taken for pain and to prevent infection.  At most, the plaintiff's claim amounts to a difference of opinion about how he should have been treated.  Such a claim is not cognizable.  *See Chance*, 143 F.3d at 703 (difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference); *Sonds*, 151 F. Supp. 2d at 311 ("fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment" does not support an Eighth Amendment claim) (citation omitted).

The plaintiff has not provided evidence that defendants Silvis, Naqvi or LaFrance were deliberately indifferent to his medical needs on the day of the assault or on any of the days immediately following the assault.  The motion for summary judgment is granted on this ground.

### b.  Dizziness and Headaches

On June 2, 2008, the plaintiff complained of headaches due to the assault.  He left the medical department, however, before the nurse could finish her assessment.  (*See* Defs.' Local Rule 56(a)1 Statement, Attach. 2 at 240, 573.)  Dr. Naqvi treated the plaintiff on June 18, 2008, but the plaintiff did not complain of headaches.  Dr. Naqvi did prescribe Motrin for the plaintiff's back pain.  (*See id.* at 572.)  In early November 2008, Dr. Naqvi examined the plaintiff due to

various medical complaints, including dizziness.  He prescribed a medication to treat the

plaintiff's dizziness.  (*See id.* at 310, 558.)  The medication was discontinued in mid-December

2008, when the plaintiff complained that it was causing his joints to ache.   (*See id.* at 228.)

Prison officials at MacDougall transferred the plaintiff to Garner on January 29, 2009. (*See id.* at

303, 544, 547.)

The plaintiff claims that he made many complaints about feeling dizzy and about blurred

vision.  He also contends that defendants Naqvi and Silvis should have ordered that he undergo

an MRI or CT scan of his brain due to the fact that he had suffered trauma to his head during the

assault.  The medical records only include the few complaints of dizziness and headaches listed

above.  Dr. Naqvi did prescribe medication for the plaintiff's complaint of dizziness.

Because the plaintiff's glasses had been broken during the assault by Inmate Civitelli, an

optometrist examined the plaintiff on April 25, 2008.  The optometrist found no evidence of

trauma to the plaintiff's eyes as a result of the assault.  (*See id.* at 260.)  The plaintiff has failed to

submit any other evidence in support of his claims that he suffered from symptoms of dizziness

or blurred vision or that his symptoms warranted an MRI or CT scan.  The plaintiff has not

supported the claim that defendants Silvis, Naqvi or LaFrance were deliberately indifferent to his

medical needs during the time period from the day of the assault until the plaintiff was

transferred to Garner at the end of  January 2009.   The motion for summary judgment is granted

on this ground.

### c.  Neck, Shoulder and Back Pain

The plaintiff also contends that Drs. Naqvi and Silvis failed to treat his complaints of

neck, shoulder and back pain.  The plaintiff's medical records reflect that in November 2007, Dr.

Silvis ordered that the plaintiff undergo an x-ray of his spine due to complaints of back pain.

(*See id.* at 65, 97.)  In December 2007, Dr. Silvis examined the plaintiff due to his complaints of shoulder and back pain.  He ordered that an x-ray of the plaintiff's shoulder be taken, and that blood tests be performed, and he prescribed 600 milligrams of Motrin to be taken three times a day as needed for six months.  (*See id.* at 64-65, 94-96, 207-08.)

The x-rays taken of the plaintiff's right shoulder on December 26, 2007 revealed some mild degenerative changes involving the AC joint, but no acute abnormality.   X-rays of the plaintiff's lumbar spine on November 7, 2007, revealed moderate osteoarthritis.   (*See id.* at 207-08.)

On March 5, 2008, Dr. Naqvi prescribed 600 milligrams of Motrin to be taken by the plaintiff three times a day for two months.  The plaintiff was permitted to keep the Motrin on his person.  (*See id.* at 319.)

On April 6, 2008, Dr. Naqvi examined the plaintiff pursuant to his complaints of back and shoulder pain.   Dr. Naqvi noted that he would continue to treat the plaintiff's back and shoulder pain with 600 milligrams of Motrin to be taken three times a day.  (*See id.* at 578.) On April 16, 2008, Dr. Silvis examined the plaintiff for various medical conditions, including his complaints of arthritis.  Dr. Silvis noted that the plaintiff suffered from degenerative joint disease and prescribed an analgesic balm to be used on the plaintiff's joints once a day for six months. (*See id.* at 577, 317.)

Dr. Naqvi examined the plaintiff on June 18, 2008 due to his complaints of back pain.  Dr. Naqvi noted that the pain was controlled by Motrin.  He prescribed 600 milligrams of Motrin to be taken three times a day for three months.  (*See id.* at 572.)

In August 2008, the plaintiff informed a nurse that he had back and shoulder injuries that caused him pain.  He indicated that he was taking Motrin which helped to alleviate his pain.  He

requested that he be given a bottom bunk pass as his back and shoulder injuries made it difficult for him to climb to the top bunk. Dr. Naqvi examined the plaintiff in early September 2008 and diagnosed him as suffering from musculoskeletal pain in his back and shoulder. He prescribed both Motrin and Tylenol to treat the plaintiff's pain and artificial tears to treat the irritation to the plaintiff's left eye that had caused blurry vision. Dr. Naqvi also issued the plaintiff a bottom bunk pass to be used for six months. (*See id.* at 312, 567.)

In late November 2008, Dr. Naqvi prescribed 600 milligrams of Motrin to be taken for three months to treat the plaintiff's pain, renewed the order for a bottom bunk pass for six months and prescribed an abdominal binder for the plaintiff's back pain. (*See id.* at 307-10.) In early December 2008, Dr. Naqvi prescribed an analgesic balm to treat the plaintiff's joint pain and renewed the prescription for 650 milligrams of Tylenol. (*See id.* at 307.) In response to the plaintiff's request that he be transferred to another housing unit, Dr. Naqvi directed the plaintiff to speak to the unit manager or correctional treatment officer in his current housing unit. (*See id.*.)

When the plaintiff attempted to commit suicide on January 29, 2009, medical officials at MacDougall transferred him to Garner for treatment in the facilities mental health unit. (*See id.* at 547.) The plaintiff remained at Garner until the filing of the complaint.

The medical records, including x-rays of the plaintiff's shoulder and spine revealed moderate osteoarthritis in the plaintiff's spine and mild degenerative changes in the plaintiff's shoulder. Drs. Naqvi and Silvis addressed the plaintiff's complaints of pain in his shoulder, neck and back, issued him a bottom bunk pass and prescribed medication to alleviate the pain. The plaintiff has failed to support a claim that defendants Silvis and Naqvi were deliberately

indifferent to his neck, shoulder or back pain during the time period from December 2007 to late January 2009.  The motion for summary judgment is granted on this ground.

### 5.  Defendant Castro

The plaintiff alleges that at some point after May 2009, he sought treatment from Dr. Castro for pain in his neck, back, shoulder and wrist, possible neurological damage, dizziness and blurred vision.  The plaintiff states that Dr. Castro submitted a request to the URC to have him undergo various tests to determine whether he suffered from neurological damage, but the URC denied the request.  The plaintiff concedes that Dr. Castro scheduled him to be seen by an optometrist, submitted a request to URC to have him seen by an audiologist in June 2007 and prescribed Tylenol with Codeine to treat his various painful medical conditions.  The plaintiff claims that Dr. Castro's treatment of his painful injuries from May 2009 until May 2010 was inconsistent.

After the plaintiff's transfer back to Garner at the end of January 2009, the plaintiff remained in the mental health unit until February 5, 2009.   On February 17, 2009, Dr. Castro prescribed Tylenol and Motrin to treat the plaintiff's joint pain.  (*See id.* at 301.)   Dr. Castro examined the plaintiff several times in March 2009 and prescribed Tylenol with Codeine for pain in the plaintiff's joints as well as an ankle brace for the plaintiff's left ankle, a knee brace for the plaintiff's left knee and a wrist support for the plaintiff's right wrist.  (*See id.* at 534.)  The medical records reflect that Dr. Castro prescribed Motrin from March 2009 to January 2010 and Tylenol with Codeine from March 2009 to May 2010 to treat the plaintiff's symptoms of joint pain.  (*See id.* at 300, 653-75, 843-89.)

In June 2009, Dr. Castro also issued the plaintiff a one-year pass for a bottom bunk pass. He renewed the pass in April 2010 for a year. (*See id.* at 672.)  In August 2009, Dr. Castro prescribed a muscle rub to treat the plaintiff's osteoarthritis. (*See id.* at 669.)

An x-ray of the plaintiff's spine in January 2010, revealed moderate to severe degenerative joint disease. (*See id.* at 616.)  At that time, Dr. Castro discontinued the order for Motrin and prescribed Naproxen and Tylenol with Codeine to treat the plaintiff's joint pain. (*See id.* at 657.)  In mid-February 2010, Dr. Castro renewed the order for Tylenol with Codeine for another thirty days.  In April 2010, Dr. Castro renewed the order for Tylenol with Codeine for another thirty days and also renewed the order for  Naproxen until August 2010. (*See id.* at 653-56.)  Prison officials at Garner transferred the plaintiff to Cheshire Correctional Institution in June 2010. (*See id.* at 631.)

In late January 2010, the plaintiff filed a grievance regarding the alleged failure of Drs. Silvis and Naqvi to order that he undergo various diagnostic tests, including an EEG, MRI and CAT Scan, after he was assaulted in April 2008.   On February 1, 2010, Dr. Castro denied the plaintiff's grievance because there was a lack of clinical basis for the studies/scans requested by the plaintiff. (*See id.* at 609.)  Other than in that grievance, there is no evidence in the record that reflects that the plaintiff complained of or sought further testing for these symptoms.

The medical records reflect that Dr. Castro examined and treated the plaintiff on a regular basis for his complaints of joint pain.  Dr. Castro prescribed multiple medications to treat the plaintiff's pain as well as braces or supports to provide stability to the plaintiff's joints.   The plaintiff has failed to offer any evidence to suggest that Dr. Castro was deliberately indifferent to his medical needs during the time period from March 2009 to June 2010, when the plaintiff was

transferred to Cheshire Correctional Institution.   The motion for summary judgment is granted on the medical claims against Dr. Castro.

C.     **Section 1985, 1986 and 1988 claims**

On the first page of the complaint, the plaintiff asserts that he has brought this action pursuant to 42 U.S.C. §§ 1985(3), 1986 and 1988, in addition to 42 U.S.C. § 1983.  In order to state a claim under section 1985(3), plaintiff must allege: (1) the defendants were part of a conspiracy; (2) the purpose of the conspiracy was to deprive a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act taken in furtherance of the conspiracy; and (4) an injury to his person or property, or a deprivation of a right or privilege. *See Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971). Importantly, the plaintiff must show that the conspiracy was motivated by a "racial, or perhaps otherwise class-based invidiously discriminatory animus." *Id.* at 102.  Section 1985(3) may not be construed as a "general federal tort law"; it does not provide a cause of action based on the denial of due process or other constitutional rights. *See id.* at 101-02.

The plaintiff asserts no facts to support a claim of conspiracy on the part of the defendants.  Nor does the plaintiff allege that the actions of any defendant were taken because of his race or other class-based discriminatory animus.  Thus, the plaintiff fails to state a claim cognizable under section 1985(3).  The Section 1985 claim is dismissed. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) (directing the court to dismiss at any time a claim upon which relief may not be granted).

Under 42 U.S.C. § 1986, liability is imposed on an individual who has knowledge of wrongs prohibited under 42 U.S.C. § 1985, but fails to prevent them.  Without a violation of section 1985, however, there can be no violation of section 1986. *See Mian v. Donaldson, Lufkin*

*& Jenrette Securities Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993).  Because the plaintiff has not

stated a section 1985 claim, his section 1986 claim is not actionable and is dismissed.  *See* 28

U.S.C. § 1915(e)(2)(B)(ii).

Section 1988(a) provides that the district courts shall exercise their jurisdiction over civil

right cases in conformity with federal law or, where appropriate, state law.  That section,

however, does not provide an independent cause of action.  *Moor v. Alameda County*, 411 U.S.

693, 702-06, *reh'g denied*, 412 U.S. 963 (1973).  If plaintiff is seeking attorney's fees pursuant

to section 1988(b), his claim fails.  A *pro se* litigant is not entitled to attorney's fees under

section 1988.  *Kay v. Ehrler*, 499 U.S. 432, 435 (1991).  Any section 1988 claim is dismissed as

frivolous  pursuant to 28 U.S.C. § 1915(e)(2)(B)(I).

### D.      Americans With Disabilities Act Claim

The plaintiff makes a passing reference to the Americans With Disabilities Act on page

five of the complaint.  He asserts that Dr. Oliveira's recommendation that he be transferred from

Garner to MacDougall in August 2007, despite the fact that he suffered from schizophrenia and

anxiety and was over age fifty-seven, violated his rights under the ADA.

Title II of the ADA authorizes suits by private citizens for money damages against public

entities that violate § 12132.  *See* 42 U.S.C. § 12133 (incorporating by reference 29 U.S.C. §

794a).  It provides, in relevant part: "Subject to the provisions of this subchapter, no qualified

individual with a disability shall, by reason of such disability, be excluded from participation in

or be denied the benefits of the services, programs, or activities of a public entity, or be subjected

to discrimination by any such entity."  42 U.S.C. § 12132.  The Supreme Court has held that

Title II of the ADA applies to state prisoners.  *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206,

213 (1998).

An individual is disabled under Title II of the ADA if he or she: (1) has a physical or mental impairment that substantially limits one or more of the individual's major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment.  *See* 42 U.S.C. § 12102(2).  "Major life activities" is defined under the Code of Federal Regulations as including "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 28 C.F.R. § 35.104; The term "qualified individual with a disability" is defined as "an individual with a disability who . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).

The plaintiff contends that his mental health conditions constitute a disability within the meaning of Title II of the ADA.  The plaintiff's bare allegation that Dr. Oliveira's decision to transfer him to another prison facility constituted inadequate or incompetent treatment of his mental health condition does not state a claim under the ADA.  The plaintiff has failed to offer evidence that Dr. Oliveira's recommendation that he be transferred to MacDougall in August 2007 resulted in the denial of or his exclusion from jail services, including mental health treatment, programs, or activities or otherwise constituted discrimination because of his disability.  The plaintiff's medical records reflect that he did receive mental health treatment at MacDougall after his transfer there.  Thus, the plaintiff has not alleged that Dr. Oliveira denied him the benefit of services or programs at MacDougall or that he was treated differently because of his disability.  *See Elbert v. N.Y. State Dep't Corr. Services*, 751 F. Supp. 2d 590 (S.D.N.Y. 2010) ("bare allegation of inadequate medical care, even when made by a person with a serious disability, does not state a claim under the ADA"); *Nails v. Laplante*, 596 F. Supp. 2d 475, 481-82 (D. Conn. 2009) (dismissing inmate's ADA claim, which focused on inadequate medical care,

because the complaint "d[id] not include any non-conclusory allegations of discriminatory animus or ill will based on his disability and idenifie[d] no program he could not participate in or any service that was denied as a result of his disability"); *Atkins v. County of Orange*, 251 F. Supp. 2d 1225, 1232 (S.D.N.Y. 2003) (dismissing mentally-disabled inmates ADA claim, which alleged that they were placed in isolation, because they did not "allege that violent and self-destructive inmates who are disabled due to mental illness are treated any differently than violent, self-destructive inmates who are not disabled due to mental illness"). Thus, the ADA claim against Dr. Oliveira is dismissed for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

## IV.     Conclusion

The plaintiff's motion for summary judgment [**Doc. No. 18**] is **DENIED**.  The defendants' motion for summary judgment [**Doc. No. 19**] is **GRANTED** with respect to all section 1983 claims.  The claims brought pursuant to 42 U.S.C. §§ 1985(3), 1986 and 1988 and the Americans with Disabilities Act are **DISMISSED**.  *See* 28 U.S.C. § 1915(e)(2)(B)(I) and (ii). The court declines to exercise supplemental jurisdiction over any state law claims.  *See United Mine Workers v. Gibbs*, 383 U.S. 715, 715-26 (1966) (holding that, where all federal claims have been dismissed before trial, pendent state claims should be dismissed without prejudice and left for resolution by the state courts).   The Clerk is directed to enter judgment for the defendants and close this case.

**SO ORDERED** this 21st day of September 2012, at Bridgeport, Connecticut.


/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge